We have two cases for argument this morning. They both have the same caption. They have different numbers. I would propose, although the Court is open to other suggestions, that we treat them as two separate cases for purposes of argument, that we first do the SIP issue, which I believe is 02-71657. Is that correct? And then that we proceed to the fifth issue. And you don't need to use all of your time. We're quite familiar with the background, but of course we have two separate procedural and some underlying substantive claims in each case, some of which overlap by way of background. So we're familiar with that. So with that, I propose we proceed with argument in 02-71657. That feature was made for me. May it please the Court, my name is Robert Baldwin. At counsel table with me is Benjamin Alke. We represent the petitioner, Montana Sulphur & Chemical Company. I want to begin by explaining what this case is not about. This case is not about air quality. There is no dispute that there has never been a monitored violation in Billings even before 1993. There have been, even since then, dramatic decreases in emissions and air quality is far below NAAQS. The data on that is undisputed. It's also, I want to make clear, that MSCC does not seek to undo those parts of the Montana SIP that EPA did approve. So those regulations that Montana proposed and EPA approved will remain in effect no matter what this Court does. And MSCC wants to make that clear, that what this Court does will not degrade air quality in Billings, Montana, where it is far superior to what federal law requires. What MSCC does seek is relief from some arbitrary conduct of the EPA concerning four specific issues that cause tremendous difficulties for MSCC. They have to do with flares, variable emission limits, auxiliary vents, and the stack height issue. I want to speak very briefly about the SIP call itself. In 1993, EPA wrote a letter to Governor Mark Roscoe saying your SIP is substantially inadequate and this requires Montana to submit SIP revisions. In 1994, EPA wrote a letter to Montana saying the sanctions clock is ticking, threatening withdrawal of highway funds and imposition of emission offsets. Under that coercive threat of sanctions, Montana did submit proposed revisions under what Montana later called the mincing oversight of the EPA that blurred the distinction between the EPA's role as overseer and Montana's role as primary regulator, all under the rubric of SIP approvability. Those were in the Montana comments to the proposed SIP action. We get to 2002 when the EPA is acting on the Montana SIP submissions and the EPA says, whoops. The 1993 SIP call was not valid. It was not final and binding. We didn't do notice and comment. Therefore, we're making the SIP call today in 2002. After we threatened sanctions and made you jump through hoops, now we're doing the SIP call that is the predicate for all of that conduct. And EPA said about the sanctions threat, it was premature because we can only impose through rulemaking and I'm quoting, it's in the excerpt of records on page 12. We can only impose sanctions through rulemaking and now I'm quoting, so that the state's response becomes a required submission under the act. In other words, nothing that EPA had done prior to that date required Montana validly to do anything. However, having threatened Montana with sanctions, having written a letter saying you are required, including to provide an attainment demonstration, EPA then seized upon that required but not required attainment demonstration to disprove the state's conduct and the state's proposed SIP. That is fundamentally unfair and it's invalid and it's an overstepping of the EPA bounds beyond an excess of statutory authority. The SIP call was also invalid on the substance. In 1993, EPA relied upon monitors, excuse me, upon modeling. It was contradicted by monitors. It said, but those monitors are not in the predicted hotspots, if you will, the areas of maximum concentration. Well, in 1993, monitors were installed there. Johnson Lane and Sacrifice Cliffs. By 2002, when EPA got around to actually doing a SIP call, which requires a finding of substantial inadequacy, by the time EPA got around to doing that in 2002, there was almost a decade of data showing that, indeed, at those hotspots, concentration levels were well below NAAQS. NAAQS wasn't threatened. There was no basis for a finding of substantial inadequacy in 1990, excuse me, in 2002, or back in 1993. The data from the monitors showed that the model grossly overpredicted concentrations, and that is not a surprise. Could I go back to the, I guess I'll call it the revised SIP call, the 2002? Yes, ma'am. Is that correct? So by the time you filed suit, there had not only been the SIP call, but various actions had been taken, is that right? That is correct. So could you be precise about what it is, what your injury, in fact, was at that juncture? In 2002? At the time you filed suit. At the time we filed suit, of course. With respect to the SIP call. Yes. When EPA issued the SIP call in 1993 that turned out not to be a real SIP call, it said this is not right for judicial review, citing Greater Cincinnati. That case does indeed say that you cannot appeal a judicial review of a SIP call until after the state submits something, EPA acts. Once that occurred and the case became ripe, we filed this petition seeking review of not only the SIP call, but also the EPA's action on the SIP submission in 2002. So by the time we filed this case. They had taken action on the SIP submission.  The state SIP submission. Yes, Your Honor. Now, it's not surprising that the model that was done in the late 80s overpredicted, because that's what it's designed to do. There were two models used, one for simple terrain, one for complex terrain. The complex model was, in fact, a screening model. Under EPA's own guidelines, you don't rely on a screening model. You use that as a broad brush first step to see if there's potential problems. The guidelines say if that reveals a problem, what do you do? You use a more refined model. The more refined model here existed. Commenters said, EPA, you ought to use that. EPA said, no, we are not going to use that more refined model. And the reason was, this is in the record, the reason why we're not going to use that more refined model that our own regulations require is because it requires scientifically rigorous meteorological data. Now, think about that. A model is a cyber world prediction tool subject to garbage in, garbage out, just like every other computer program. And if you feed it inaccurate assumptions, you get inaccurate results. And therefore, its own regulations said, use the more accurate model. And it required scientifically rigorous data. That is accurate data to get an accurate result. EPA said, no. At the same time, they're demanding deference because this is scientific material. But when it comes time to be accurate and scientific, EPA violates its own regulations. That is per se arbitrary and capricious for an agency to violate its own regulations and to refuse to engage in a scientifically rigorous and accurate analysis. Now, the EPA, let me mention, under Vigil v. Levitt, this court's decision, this court has said it will not rubber stamp agency decisions. It will look for a rational connection between the facts found and the choice made. It will make sure that there is a well-reasoned and well-grounded decision. And that doesn't exist when the EPA just says, no, we're going to use the screening model that our own regulations say we should not. This is important because the EPA does not have the right, under the structure of the Act, to just regulate. EPA is an overseer. States have primacy. EPA is relegated to a secondary, strictly circumscribed role. And the courts say that. Train, Union Electric, Florida Power and Light, and so on. There's many more cases. They're cited in the briefs. So EPA doesn't get to just come along and say, we're going to call for a SIP revision because we think it might be improved somewhat, or we think it's marginally inadequate. EPA can only act if it's substantially inadequate. Its own guidelines tell us that, for when to call a SIP, tell us that if recent air quality levels are substantially above the NAAQS, then it's inadequate. They say that if air quality data are below or not far above NAAQS, it is adequate. So EPA doesn't have a commission to go around saying, we can improve it here and here and here, absent a finding of substantial inadequacy. Interestingly, in 2002, EPA made no attempt to find substantial inadequacy. It didn't. What it said was that our means of measurement have improved, but presumably all it is relying on is the modeling that was done ten years prior, which was now disproven and was discredited and an improper model to begin with. I would now like to turn to the specific problems and the way they've impacted MSCC. EPA disapproved the Montana SIP because it did not have limits on flares. Flares are a safety device. I won't go through all that. We may talk more about that in the next case. EPA wanted, under this mincing oversight, it had rejected and said, we're going to disapprove that if it doesn't have these certain limits. EPA wanted a strict numerical limit, even during startup shutdown and malfunction, when it's not safe to not use your flares at times. EPA wanted that. Montana didn't give it in a SIP submission. EPA disapproved the SIP on that grounds. No other SIP or FIP in the country has short-term numerical limits on flaring during startup shutdown and malfunction. As we've said in the brief, EPA recognizes that's not safe, that's not feasible, even in an NSPS context. That is arbitrary and capricious for EPA to impose that specific requirement upon the state. The cases say EPA doesn't have that authority. States have unbridled authority. As long as they're meeting NAAQS, an EPA can't disapprove because it doesn't like the choices the state made if it's meeting NAAQS. On the auxiliary vents and the 30-meter stack, we're talking about a 12-pound per three-hour limit here. 12 pounds per three hours. Let me put that in context. Montana Sulphur's main stack can emit up to 3,000 pounds per three hours. It is monitored with EPA-approved monitoring equipment that has a... Can I go backwards? Yes, ma'am. I know there's a lot to cover. There's a lot to absorb. I just want to go back to the flares, and I'm looking at what I think the EPA said when it disapproved it. It basically, and a lot of these are fairly specific, they said that the state modeled routine flare emissions assuming they would be limited to, and then they give 150 pounds in the three-hour period, but did not include corresponding emission limitations in the SIP. Precisely, what is it about that finding that's arbitrary and capricious? Because there was no finding that it was necessary to attain NAAQS, Montana assumed lots of things. In a model, for instance, you assume a background concentration. That accounts for the sulfur from the natural gas I burn in my house to heat it, from the cars, from the boilers in the hospitals and office buildings. EPA didn't say, we've got to monitor and limit all that, too. Not every source requires an emission limitation. NAAQS is the goal. EPA has authority to require that the SIP meets NAAQS. It doesn't have authority to micromanage how the states arrive at that. A finding that, well, the state modeled it, therefore, we assume it's necessary, is not a rational connection between a fact found and a choice made. It is an assumption, which does not satisfy the EPA's obligation to consider the facts and make a finding. In fact, EPA did say, we modeled at 500 pounds per three hours, and that would protect NAAQS. That was also in the 2002 action. Now, what EPA didn't say is, we modeled it and found out that X is necessary to meet NAAQS. EPA never engaged in that analysis. EPA made assumptions that if Montana modeled it in an attainment demonstration, that EPA improperly required at the outset. So EPA is building upon this attainment demonstration to draw assumptions without finding facts, without finding that it was necessary. Your Honor, have I answered your question? Yes, thank you. On the auxiliary events, 12 pounds per three hours, a very minor source, but EPA imposed stringent and redundant compliance and monitoring methodologies on that limitation and tightened it up even further through a sulfur and fuel content limitation. MSCC's main stack has a margin of error on the monitoring that EPA has approved of plus or minus 10 percent or plus or minus 300 pounds per hour. The 12 pound per three hour limitation on the auxiliary stacks is de minimis. It's pointless and there's no rational basis for EPA to impose these troublesome, expensive and vexatious monitoring and compliance requirements. On the variable emission limit, it was just arbitrary and capricious to treat MSCC differently than the other two sources. EPA said, well, the stack height issue was unresolved, but whether the stack height ultimately turned out to be 65 meters or 100 meters doesn't matter. The emission limit could have been variable, just like it was variable at the other sources to apply to their stack height, whatever that was determined to be. So that was per se arbitrary and capricious to treat similarly situated sources very differently. On stack height, I'm going to try to save some time for rebuttal, but I'm not sure I will be able to do that. Stack height is this analysis. You have to determine, good engineering practice, stack height, and you can do that through a formula or a fluid modeling. But you do that to determine stack height to use to determine emissions limits. That's the process. EPA wants to mix that up and say once you engage in a certain fluid modeling demonstration to determine stack height, you fix the emission limit at NSPS. And that's one of the problems here. There are two ways to determine stack height. Fluid modeling or the formula. Stack height is the greater of de minimis, 65 meters, the formula height, or the fluid modeling demonstration height. MSCC satisfies it in both ways and deserves a stack height of 97.15 meters. Does that get us into the nearby structure problem? It does. Okay, so, without then getting into which of these means you might determine it by, why shouldn't we defer to the agency's own interpretation of its regulations, particularly something such as what is a nearby structure? Because the regulation is not ambiguous. The regulation very clearly defines a nearby structure as those within 5L, L being the lesser of height or width. The width here of the support structure is 8 feet. And 40 feet, it's within 40 feet, under the definition, it is clearly a nearby structure. Just as in Exxon Mobil, that nearby structure helps support the stack, here this structure helps support the stack and fulfills other functions. It holds meteorological equipment, a flare, monitoring equipment, and so on. So, EPA gets deference perhaps when the regulation is ambiguous. But here, if you would, I want to call your attention to pages 36 and 37 of EPA's brief, where what they go through, their analysis of these issues, and there are three issues. There are the NSPS issue, if you will, the nearby issue, and the MACS versus NACS issue. On each one of those, it's remarkable in their brief at pages 37 and 8, there's a litany. EPA interprets ambiguous standard to mean NACS only. It doesn't tell us where the regulation says that. In fact, the regulation is quite clear that an ambient standard is an ambient standard. There's no confusion about that. National standard is defined two pages earlier. They didn't use that defined term. EPA then continues in its brief, we interpret allowable emission rate to mean that NSPS must actually be imposed. EPA interprets nearby to mean not connected. Well, EPA has interpreted a clear and unambiguous regulation beyond recognition. EPA is not arguing the regulation says those things. EPA is arguing it wishes the regulation says those things. But it doesn't. And EPA is not entitled to... Well, yes, you know, then you're in the statutory interpretation land as to whether, if their interpretation contradicts the plain meaning, then you have one set of cases. But if there's leeway within the regulations, which there may be here because it doesn't say attached or not attached, then why isn't it rationally consistent, although not the only interpretation one could give? Well, that's a fair question. But the fact is the regulations, they don't say it can't be connected. They don't say they can't be blue. Can EPA just arbitrarily exclude blue buildings? I mean, the definition is very clear. If you're within 5L, it's a nearby building. Now, the regulation does itself acknowledge that if EPA is not satisfied that the structure actually is accurately represented by the formula, it can call for a fluid modeling demonstration. EPA did that. It acknowledged in an early letter that this is a nearby structure, but we have doubts. We want fluid modeling. Montana did that at great expense and a great commitment of time and has satisfied that modeling demonstration requirement, and it ought to be given credit for that. Your Honor, I'd like to save my remaining minute for rebuttal, if I may. You may. Thank you. Good morning, Your Honors. I'm Martin McDermott. I'm with the U.S. Department of Justice in Washington, and I represent the United States Environmental Protection Agency. With me at table as co-counsel is Jonas Stahler from EPA Region 8. He did integral work on the rules in question today. I'd like to start by, I suppose, addressing the procedural argument. There are two arguments that counsel advanced today and advanced in their reply brief that were made for the first time on reply. I don't think there could be any serious argument by counsel that that's not the case. The two arguments are the concept that EPA needed to take notice and comment on the SIP call. You will read their opening brief, which took advantage of the full word count offered by the court, and you will find no reference whatsoever to that argument. I would suggest to the court that it's entirely improper for that argument to be raised for the first time on reply. The second argument that's raised for the first time on reply is this notion of what I would call the M-plus model, that they say that EPA utilized the wrong model. First of all, it wasn't EPA's modeling. It was the state's modeling, so that's incorrect. But beside that, this, again, is an entirely new argument raised for the first time on reply. Again, you can read their opening brief. It has many, many arguments in it. It does not include that argument, and I believe it's entirely inappropriate to raise it for the first time on reply. They were aware of the argument. It's something that they commented on to the agency, but chose not to put in their opening brief. I think then that what I'd like to turn to, I suppose you might call a, I guess it's a jurisdictional argument, really, and it's about the SIP call. Our view is that the SIP call, as is meaningful for this case, was issued in 1993. There is something in the record that indicates that it was formalized in 2002, and that's correct. And had EPA attempted to impose sanctions back in the 1990s on the state, the state might have been able to raise an argument at that time to say, EPA, you needed to take notice and comment on the SIP call. The statute doesn't expressly say EPA needs to take notice and comment, but the state might have been able to raise that argument. But what we need to assess here is the argument, really, that was made in Montana Sulphur's opening brief, which is the SIP call had no factual predicate. It was wrongly issued because EPA entirely misrepresented, misunderstood the pollution landscape in 1993. Their argument on that, and this is where I also object to the fact that what Montana Sulphur does in its brief, is it looks at information after 1993 to say, well, look at air quality in 1994, 95, 96. That shows the SIP call was wrong. Well, the SIP call was issued in 1993, and it did set in motion many things. Montana Sulphur's point on that is this. They say, well, when you issued the SIP call, there was an extensive monitoring network in place, and those monitors did not reflect that the NACs were being exceeded. EPA's rejoinder to that was a view that was entirely shared by the state of Montana. To wit, the monitors were not located in the locations of maximum concentrations. There was not an extensive monitoring network. In fact, I believe it was in January of 1987, there was a single monitor in Billings. There were some, I say in my brief, and Montana Sulphur notes that some were added later. They focus on 1993 and say, well, look, at the end of 1993, there were, I think, perhaps six or seven monitors in place in Billings. But what they ignore is the fact that the SIP call was issued in March of 1993, and the monitors that they're talking about were added in the summer of 1993 and the winter of 1993. So essentially the data set that the state of Montana and EPA had in front of it in 1993 was information that predated 1993. When you make a SIP call, you're basing it upon information that you have in the record from really from the 1980s and early 1990s. Montana Sulphur here tries to, in challenging the SIP call, they're trying to say, this is EPA out on a lark. EPA is a rogue agency, basically running amok. They're not taking cognizance of the state's interests. But the reality is that the studies that were done in the early 1990s, the modeling studies were done by a private consultant hired by a source and by the city of Billings. And that modeling was then confirmed by the state of Montana. What did it say? It said that, okay, we are not finding exceedances of the air quality standards with the monitors. But we don't have enough monitors. They're not located in places of maximum concentration. And when we run the models, and I say we, I'm talking about not EPA. I'm talking about the state and the city of Billings. When you run the models, you find, well, actually, if you had enough data, you would find the NACs are being violated. So all of the verbiage you find in the brief, which goes to the point, the NACs are being complied with. Air quality was fine. Why are you issuing a SIP? Well, the reality is that the state and EPA and the local government, city of Billings, all believed that the modeling showed that there were violations, if you had sufficient monitors to detect it. Could you help me with something? I'm not sure I understand. Montana Sulphur has said that they didn't file suit until after what you've described as the formalization of the SIP call in 2002? Yes, that's correct. Their suit was really prompted by the fact that EPA did not do a SIP disapproval until 2002. And that was when EPA actually formally proposed disapproving the SIP in 1999. The SIP call was in 93. Then there was an attempt by the state to come up with an implementation plan that satisfied EPA, largely did. But in 99, EPA said, there are defects, we need to improve certain elements. And in 2002, EPA said, we are disapproving selected parts of your SIP. And so they filed suit in 2002. Okay. So at that point in 2002, is it irrelevant to look at the data that was collected from these other locations from, I guess, the winter of 93 through 2002? I believe it is largely irrelevant. Because basically, and this is what, you know. That sounds like burying your head in the sand to me. Well, it's not that it was completely ignored. Okay. What happened was there was modeling in the early 1990s that showed there was a problem. The state then, in the mid-1990s, not EPA, the state did confirmatory modeling that said, yes, there is a problem. And the state very clearly, we quoted in our brief, said, we recognize there's a problem. We need to fix our SIP. And then the modeling that was done that created the emission limitations was based upon all of the data that was available. Years of weather data, monitored information, modeled information. The modelers put in all kinds of input. They're not ignoring the monitor. It's just that what they're not doing is they're not saying, if the monitors don't show a violation, then you're scot-free. That's the operative fact. I understood the lawyer from Montana, Sulphur, to say, they are not challenging anything that Montana proposed in response to the SIP call. Yes, that's correct. So that leaves only those things that you found were inadequate. Correct, which is quite a small subset of the SIP, yes. So that's really all we're arguing about on the SIP call, aside from procedural issues. That's all we're arguing about, really, with respect to the SIP disapproval action. The argument that I advance in the brief, and I think it's supported by the greater Cincinnati cases, the SIP call is a predicate. It's a first step. It's a recognition that there's a problem. The state agreed there was a problem. The state then set out. The state said, in essence, we recognize we have a problem. New industries aren't going to be able to come into the Yellowstone Valley if the existing industries are basically using up all of the allocated pollution. We have a problem here. Let's fix it. They endeavored to fix it. They did an attainment demonstration that showed, using the models and the entire panoply of regulations, they came up with a plan that said, here's how we're going to fix the SIP. And EPA worked with them on that and basically was in agreement with them on probably 95 percent of the issues. Now, with respect to concern for new industry, Montana clearly, I think, has the authority to build that into its regulation. But does EPA? Can EPA say, well, you meet Max, but somebody else might come along and therefore we're going to – can EPA – does EPA have the authority to do that? That's another point that I believe sort of gets left behind in Montana Sulphur's brief. If you look at the statute, the statute does have – its touchstone is meeting the NAAQS. But the statute also says that a SIP, a state implementation plan, must meet any other applicable requirements of the act. So that's one element of it, but there are all kinds of other elements, like monitoring. You know, a plan that looks like it's going to meet the NAAQS because you have the right emission limits, if you don't have the appropriate enforcement and monitoring mechanisms, it might all be for naught. So it's not – you don't simply ask – the simple question that they would propose that is the be-all and end-all is, do monitors show that the NAAQS are being violated? If not, it's over. EPA has no role. Go home. You know, that's not the way it works. I mean, what this court has said as recently as February of 2011 is that the administrator of EPA has a duty, has an obligation under the act to make sure that the SIP is good in all of its elements. And that includes elements that actually get way down in the weeds, like, well, do you have sufficient ways to monitor what you're putting up your stack? And that's some of the things that they're complaining about here. How do you rebut the argument made – and I'm not suggesting it's correct, but it was made – that your own regulations required you to look at a monitoring model in addition to the one that you actually used. Is that just wrong? This is the argument that I'm saying is the new argument. That's the new argument. M-plus. Yes, well, that's actually discussed in the Federal Register in fair detail, although not in the briefs, not in our brief. You won't see it because it wasn't raised. I understand you're saying we can't consider it, but suppose we decide to consider it. What I would suggest is you then look at our brief, and it points you to the right place in the record where EPA responded to the comment, hey, there's this M-plus model. This is the one you should use. And EPA said, not so fast. We don't think it's the appropriate model in this situation. And there were several defects, but one of them was there wasn't sufficient meteorological information available to do it. And Montana Sulphur suggests that, well, we offered that data, and EPA declined it, but the record actually shows it. The true story was more like they said, would you like the data, and EPA said, show it to us, but did not. That data was never supplied sufficiently. What about with the flares? I guess their argument, I thought, was a little bit different if I understood it. And they were saying that, in their view, you had to meet the NACs, which you've said you do, but that there was a false assumption by EPA just because of the modeling that there was some kind of problem. And, therefore, there shouldn't have been, you know, that there's no evidence on the flares that there was a problem. What's your response to that? Well, I think Montana Sulphur really wants to have it both ways. When EPA doesn't second-guess the state, they suggest, well, why aren't you second-guessing the state? And when EPA does second-guess the state, they say, why are you doing that? They want it both ways, and the flares were an example of where that happened. The state of Montana, when it submitted its SIP to EPA, had an emission limit for flares in it, and it utilized that limit when it did its attainment demonstration. Ultimately, because of a dispute about startup shutdown and malfunction provisions, I think it's probably, looking back at the record, it looks like that's the reason, Montana Sulphur then said, well, we're going to maintain a limit on flares. And the record shows that they thought there was some good reason to do that, but we're just going to have it as a state-only limit. It just applies to state court proceedings. It's not federally enforceable. EPA properly looked at that and said, wait a minute. You recognize that flares put out pollution. Oh, yeah, they do, and it's not, there's no de minimis rule in the Clean Air Act. It's not like, well, you can, you know, as long as it's not over X tons a year, go ahead, just do it. You don't have to account for it. There's nothing like that in the act. And so EPA said, well, you accounted for it in an attainment demonstration. You have a state limit on it. That needs to be in the SIP, and that was the reason they disapproved it. I think that perhaps earlier your question got into, isn't that the sort of thing that's, is there something, is that an irrational decision? Is that an arbitrary decision? Is that something that undermines the Clean Air Act's goals, which are, let's keep in mind, I don't think you'll get this from reading their brief. It's to assure that the NACs are attained. They make it sound as if, well, you know, everything has to be necessary. You go through a checklist and you go, is that really absolutely necessary? Can you prove it's absolutely necessary? And it's like, well, wait a minute. What the Ninth Circuit and other courts have said is we need to assure. Congress wanted the agency to assure. That means guarantee. That means if you say you're going to be there, you're there. There's a pretty good chance, you know, there's a substantial probability I'll be there. We're going to assure it. Does that mean the EPA takes a conservative approach on many of these issues that I would say are down in the weeds? Yes. Okay, well, speaking of being down in the weeds or up in the air, whatever you want to call it if you get to the stacks, that seems to have maybe in contrast with some of these other issues what I'd characterize as a slightly more legal-related issue. So the nearby structure says it's got to be these, you know, within 5L. And they say, well, this structure is within 5L and it is nearby, end of story, and that you can't, in effect, insert a little caret and say nearby, comma, attached structure. That is a legal interpretation question. I think it is a legal interpretation. And, I mean, it's certainly down in the weeds. It would be, in my career, it would be hard to find a situation where more ink and more paper was utilized in the pursuit of an issue that really is of very marginal consequence here. And let me tell you why that is, and then I'll try and answer the question as I understand it. Ultimately, EPA disapproved what the state did on the stack. But the state, out of the state's process, came an emission limit. Montana Sulphur can meet it, has met it. There may be a couple situations when they've exceeded it. I don't know that that's the case. But, basically, they can meet the limit that the state came in with. Can they meet the limit that EPA came up with? Yes, they can meet it. There's no allegation that the result of the process that EPA utilized here in using the stack height calculations had any real impact on them. Did EPA require them to take the stack down? No. Did EPA say, well, you have a 100-meter stack, you can't use it? No. Did EPA say, you have to take 35 meters off your stack, reduce it to 65? No. Can they meet the limits? Yes. So all of this amounts to- You're saying that it has all to do about nothing in the end because the stack stays up and it doesn't matter as long as they meet limits? Yes. Basically, the limit that emerges from that, I believe it's roughly 3,000 pounds. EPA did not even change the annual limit, which, by the way, I think this gets a little lost in the weeds. Montana software in a year is allowed to emit 9 million pounds of SO2. You read the brief and you're kind of like, jeez, I guess they're putting out a little bit, a little puff every now and again. I mean, why are they being picked on here? Nine million pounds a year is the limit that the state found. And EPA did not, ultimately EPA left that limit in the fifth in place. What EPA did was it reduced the amount that they could emit by, I think, about a third. But they didn't, EPA, there's no claim by Montana software in the end that, well, we could have met the limit. Oh, wait a second. Let me just get this straight. It's not a question of taking the stack down, though, but isn't it a mathematical calculation of credit? Yes. So you can't say it doesn't have any effect. It's a question of within the stack height calculations, EPA did impose EPA's view. Yes. Oh, it has an effect. It has an effect. What I'm saying to the court is Congress could have written a statute to say unless you comply with ‑‑ You didn't really answer my nearby stack. Okay. To get into that question, I just wanted to sort of give a little context here for, in the end, the limit that emerged from all of this is a limit they can meet. So perhaps it would be a much stronger argument for them if they said, now that EPA's used this wrong stack height, you're only giving us credit for 200 meters. That doesn't make sense to me because, I mean, all kinds of things might be technologically feasible to meet, they might be more expensive to meet, but that's not really the standard that you can meet. The question is, what is the appropriate standard and is it a reasonable standard? So whether they can meet it or not doesn't seem to me to answer the question. Perhaps it's not directly on point, but I think it's worth understanding. Let's get to the nearby spillway. So the question you've asked is a legal question. I would say, yes, it is. But we could certainly spend a lot of time trying to explain how the stack height regulations work and all that. But I think we can cook it down to this, that there are several critical definitions in the regulations that EPA has explicated and EPA explained contemporaneous with issuing the regulations. Here's what we mean. When we say an ambient air quality standard, we mean a standard that has significance. All your time is running out. Yes. And about five minutes ago I asked a real simple question. Yes. What's the basis for saying it has to be attached? That's my simple question. It's EPA's interpretation of what nearby means. And it's a common sense interpretation. There are guidelines that also talk about how it doesn't apply properly to a very tall structure. But essentially it's a legal interpretation. I believe that's correct. What about EPA has some other areas, for example, when it talks about ambient air quality standard, but then EPA kind of inserts except state standards. Yes. What's the basis for that given that in previous sections they're included and some they're not? So how do we know when they're included and when they're not? Well, I think if you look at the preamble, you know, after the argument is over, if you look at the preamble that we point to in the brief, EPA explains that when we say ambient air quality standard, we're referring to a national standard, not some other standard. And what we submit to the court is that the language is not crystal clear, that it's entirely appropriate to look at the preamble, and EPA in the preamble sets out what it means, how it reads those operative words. And that's exactly the sort of area where courts routinely give deference to an agency. Thank you. I think your time has expired unless there's other questions. I guess I just had one. Yes. Was your point that if something is nearby, it's necessarily separate and therefore not attached? I mean, one wouldn't use the word nearby ordinarily to refer to the same building. Correct. But you didn't really say that. I'm just asking you to say that. No, that's correct. I mean, it's just this notion that you have a stack structure, which essentially circles. All right, you've answered my question. That's not a nearby structure. It is the structure. And, you know, we think that's common sense. We don't think you have to go real far. And the state agreed with that, by the way. You don't have to go way into the regulations to get to that conclusion. I think we have your argument in mind. Thank you. Okay, thank you very much. Very quickly, Your Honors. Very often a stack sticks out of the top of a factory. That structure is attached to. It supports the stack. It is a nearby structure, and it is used in the calculation. There's nothing in the regulation that suggests that this structure should not be counted. In fact, the structure is not a stack. A stack is defined in the very regulation as a point designed to emit. This stack cannot emit. It's not designed to, and it cannot. What about his argument that you've raised a couple of very significant points for the first time in your reply? Thank you. We argued in the opening that you can't rely on this modeling to call the SIP. He came back and said, oh, yes, we can hear all the guidelines. We responded by pointing out that you can't rely on that modeling. If you're going to rely on modeling, you at least have to follow your own guidelines. That was their response. In any event, it doesn't really matter because by 2002, EPA admitted that we hadn't done it anyway back in 1993. That brings me to my next point. Much of the argument you just heard hinges upon the SIP call having occurred in 1993. EPA said it didn't. I'm looking at the excerpt of Record 12, EPA's publication. Those were our preliminary views. We did not make a final binding finding. We finalized the SIP call action today. That last one was a paraphrase. It's just not true that EPA called the SIP in 1993. Of course, it didn't tell Montana that until 2002, but it has since admitted that. Now, they argue that's a new argument, but we didn't think we had to argue what EPA had admitted. They said it, that we didn't issue a SIP call in 1993. Now, as to the other comment at the end, Council pointed out MSCC can emit up to 9 million pounds a year. I want you to remember that figure. That will be significant in the SIP call, in the next argument. However— The FIP. Pardon? Next one is the FIP, right? Did I misspeak? FIP, SIP, whatever. FIP, yes. They say MSCC can do it. It doesn't matter. But as you pointed out, that is not the standard. MSCC can do lots of things. It doesn't give EPA authority to order it. The fact is the way that this impacts the analysis, the stack height, is MSCC has less of a margin of safety, less room for growth, and is more likely to violate federal law than it otherwise would be if the GEP stack height regulations were correctly and consistently applied according to their plain language. All right. Thank you. That concludes the argument for the SIP case. And the case of Montana Sulphur, O2-71657, is submitted. We'll now turn to argument in the FIP case, O8-72642. And welcome back. Thank you. May it please the Court, I'm me again. Because we do have separate records and sometimes these
judges: Sedwick, Hawkins, McKeown